UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MBA ENGINEERING INC., *as Sponsor and Administrator of the MBA Engineering Inc Employees 401(k) Plan and the MBA Engineering Inc Cash Balance Plan*, and CRAIG MEIDINGER, *as Trustee of the MBA Engineering, Inc. Employees 401(k) Plan and the MBA Engineering, Inc. Cash Balance Plan*, | § § § § § § § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Action No. 3:17-CV-03300-X |
| VANTAGE BENEFITS ADMINISTRATORS, INC., JEFFREY RICHIE; WENDY K. RICHIE; and MATRIX TRUST COMPANY, | § § § § § § | |
| *Defendants*. | § § | |

## **MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiffs MBA Engineering Inc.'s (MBA) and Craig Meidinger's motion for partial summary judgment [Doc. No. 107] and Defendant Matrix Trust Company's (Matrix) motion for summary judgment [Doc. No. 116]. For the reasons explained below, the Court **DENIES** the plaintiffs' motion for partial summary judgment, **GRANTS** Matrix's motion for summary judgment, and **DISMISSES WITH PREJUDICE** all of the plaintiffs' claims against Matrix. Because the Court's opinion does not depend on either party's expert witness

1

testimony or any objected to evidence, the Court **DISMISSES AS MOOT** the parties' motions to exclude [Doc. Nos. 113 and 115] and the plaintiffs' objections [Doc. No. 134]. And because the Court's opinion moots Matrix's fourth and fifth counterclaims against the plaintiffs, the Court **DISMISSES AS MOOT** both counterclaims four and five and the plaintiffs' motion to dismiss them [Doc. No. 124].

## I.      Factual Background

MBA is an engineering firm specializing in industrial process control systems. This lawsuit stems from the theft of more than $2 million from MBA's Employees 401(k) Plan and Cash Balance Plan in 2016 and 2017 by Jeffrey and Wendy Richie, the principals of Vantage, the third-party administrator of the Plans. In October 2017, the FBI raided Vantage's offices. Thereafter, the Richies were indicted for stealing from several plans for which Vantage served as third-party administrator. They pleaded guilty and were sentenced in 2020. In December 2017, MBA and Craig Meidinger, MBA's president and the Plans' trustee, brought this lawsuit on behalf of the Plans in their capacities as sponsor and administrator of the Plans and as trustee of the Plans, respectively, against the Richies and Vantage. To date, neither the Richies nor Vantage have appeared in this case, and the clerk entered default against them in July 2018.[1]

---

[1] Doc. No. 37.

In March 2018, the plaintiffs filed an amended complaint that added Matrix[2] as a defendant.[3]  Matrix provides custody and directed services to clients for which its sister corporation, Matrix Settlement and Clearance Services, LLC (MSCS) "provides automated mutual fund trade execution and settlement services."[4]  Those clients include third-party administrators of retirement plans, of which Vantage was one.  Matrix enters into the same Services Agreement with each of its third-party administrator clients.  Under this contract, Matrix agrees to provide custodial services described in Matrix's Custodial Account Agreement under the terms set forth therein, which is contained as an exhibit to the Services Agreement.  According to Matrix, it "agrees to provide its custodial services only pursuant to the terms of the [Custodial Account Agreement] because the [Custodial Account Agreement] provides certain protections and limitations of liability as to Matrix.  For the modest fees it charges for its automated services, Matrix is not willing to provide its services without the protections set out in the [Custodial Account Agreement]."[5]

Matrix and MSCS entered into the Services Agreement with Vantage in September 2012.[6]  In this agreement, Vantage represents that it "has, and at all times during the term of this Agreement will have, the requisite authority from each of its

---

[2] Matrix was known as MG Trust Company, LLC, until 2016.  For the sake of simplicity, the Court refers to it as Matrix throughout this opinion.

[3] Doc. No. 14.

[4] Doc. No. 119 at 3.

[5] Doc. No. 119 at 11.  Indeed, Matrix received less than $3,000 in compensation for the several years of custodial services it rendered here.  *Id.* at 16.

[6] Doc. No. 117-1 at 6.

3

Customers to act on their behalf in connection with this Agreement."[7]  It further represents that it "will retain absolute and complete responsibility for the supervision of all of its representatives, employees or other agents, and [Matrix] will have no supervisory, compliance or other responsibility as to the actions of such representatives, employees or agents of [Vantage]."[8]  And the agreement provides that Matrix "shall not be liable for undertaking any act on instructions from [Vantage] or for failing to act in the absence of such instructions" and that Matrix "shall be entitled to conclusively rely on the authenticity of any notice or other communication received from [Vantage] so long as [Matrix] reasonably believe[s] the notice or other communication to be genuine."[9]

After initiating a search for a new third-party administrator for the MBA Plan, Meidinger engaged Vantage in 2014.  Matrix argues that Vantage and MBA entered into a Master Services Agreement, under which the plaintiffs also appointed Matrix custodian of the Plan and authorized Matrix to perform the custodial services described in the Custodial Account Agreement.  Additionally, the Master Services Agreement purportedly included an acknowledgment by MBA that it had received and agreed to be bound by the terms of the Custodial Account Agreement.  The plaintiffs contend, however, that neither the Master Services Agreement nor the Custodial Account Agreement were in effect here.  Rather, in their amended complaint, they allege that "Matrix took possession and control of millions of dollars

---

[7] *Id.* at 12.

[8] *Id.*

[9] *Id.* at 14.

4

of assets of the Plans without there being any written, or even oral, agreement between Matrix and the Plaintiffs or the Plans."[10]

In any event, in November of 2014, as part of the transition from MBA's old third-party administrator, Fidelity, to Vantage, Meidinger ordered Fidelity to wire all Plan assets to Matrix's JP Morgan Chase bank account. From that point, Matrix provided custodial services for the MBA Plans—receiving less than $3,000 in total compensation for doing so—until the FBI raid on Vantage in October 2017. In its capacity as a custodian, Matrix—upon the directions of Vantage—ordered JP Morgan Chase to make thirty-five transfers to an account at Bank of America in the name of Vantage Benefit Administrators, among other things. In the plaintiffs' words, "Matrix unilaterally completed each fraudulent transfer of assets of the Plans into the Vantage Benefits bank account solely at the instruction and direction of the Vantage Defendants."[11] These transfers serve as the basis for the plaintiffs' various Employment Retirement Income Security Act (ERISA) claims and common-law negligence claims against Matrix.

In the meantime, the plaintiffs loaned $2,173,544.40 to the Plans to cover the losses incurred by the Richies' theft. These loans only require repayment from any proceeds acquired on behalf of the Plans in litigation.

---

[10] *Id.* at 2; *see also id.* at 3, 9, 20, 24, 30.

[11] Doc. No. 14 at 3.

## II.    Procedural Background

As described above, the plaintiffs originally sued only Vantage, the Richies, and ten John Doe defendants, who the plaintiffs could not identify but explained were "fiduciaries to the Plans and/or individuals or entities that (i) were complicit in Defendants' fraudulent scheme, or (ii) failed to stop Defendants' fraudulent scheme despite knowing or having reason to know that Defendants were engaging in this fraudulent conduct."[12]  Those original defendants never appeared, and the plaintiffs added Matrix as a defendant in their amended complaint.

Matrix filed a motion to dismiss the plaintiffs' claims against it.  Among Matrix's arguments for dismissal were that the claims were foreclosed by the terms of their Custodial Account Agreement, discussed in detail below.  Although Judge Lindsay[13] "agree[d] that the Plaintiffs appear[ed] to have amended their Complaint to strategically avoid the terms of this and another agreement that the parties to this action may or may not have executed," he concluded "that the issue of whether any such agreements were executed or are binding is best left for summary judgment practice after discovery."[14]  Discovery has now occurred, and both the plaintiffs and Matrix have filed motions for summary judgment.

---

[12] Doc. No. 1 at 5.

[13] The case was subsequently transferred to the undersigned Judge.  Doc. No. 57.

[14] Doc. No. 48 at 5 n.4.

### III.   Legal Standards

"Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party,[15] "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[16] "A fact is material if it 'might affect the outcome of the suit'" and "[a] factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[17]

### IV.   Analysis

### A.   The plaintiffs' claims are not moot as to at least $96,109.97, and the plaintiffs have standing to bring this action.

As a threshold matter, the Court must consider whether the plaintiffs' claims are moot, and, relatedly, whether the plaintiffs have standing to pursue this action. Congress imposes liability on a breaching ERISA fiduciary "to make good to such plan any losses to the plan resulting from [the breach], and to restore to [the] plan any profits" gained by the fiduciary "through use of assets of the plan by the fiduciary."[18] Further, a breaching fiduciary "shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."[19] Matrix argues that, by virtue of the loans the plaintiffs' made to the Plans to cover the losses incurred through the transfers in question, which require repayment only

---

[15] *Howell v. Town of Ball*, 827 F.3d 515, 522 (5th Cir. 2016).

[16] FED. R. CIV. P. 56(a).

[17] *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[18] 29 U.S.C. § 1109(a).

[19] *Id.*

from any proceeds recovered from litigation,[20] the Plans have already been made whole for the losses in question and that this action is therefore moot.  But, as the plaintiffs point out in their response brief, the loans totaled $2,173,544.40, and the total amount taken by Vantage and the Richies was $2,269,653.47.[21]  So, even if Matrix's legal argument about such loans is correct, the claims here are not moot, as $96,109.07 remains outstanding.

Relatedly, Matrix argues that the plaintiffs lack statutory standing to bring their ERISA claims against Matrix.  According to Matrix, this action "is effectively an action for contribution against an alleged co-fiduciary"[22] because "any recover the Plaintiff's obtain here will ultimately be used to reimburse themselves for funds that they provided to the MBA Plans and their participants."[23]  But, as discussed above, the loans from the plaintiffs did not cover $96,109.07 that Vantage and the Richies took from the Plans.  So, even if Matrix is correct that the plaintiffs would lack standing if any recovery for the Plans would in the end flow entirely to the plaintiffs themselves, the plaintiffs here do have standing because $96,109.07 is still needed to "make good" to the Plans the losses they suffered from the alleged breach of fiduciary duty.[24]

---

[20] Doc. No. 14 at 17.

[21] Doc. No. 132 at 31.

[22] Doc. No. 119 at 28.

[23] *Id.* at 19–20.

[24] 29 U.S.C. § 1109(a).  Because, as explained below, the Court concludes that the plaintiffs' claims against Matrix are subject to dismissal, the Court need not consider whether the plaintiffs' potential recovery in this action would be capped at $96,109.07.

###### B.   The Plan Documents and Custodial Account Agreement both expressly bar the plaintiffs' claims against MBA.

Satisfied that the plaintiffs' claims are not moot and that they have statutory standing to bring this action, the Court turns to Matrix's arguments that the Court should grant summary judgment to Matrix on the plaintiffs' claims against them. First, Matrix points out that the Plan documents themselves, by authorizing MBA to "appoint a Custodian of the Plan assets" such as Matrix, provide that "[t]he Custodian will be protected from any liability with respect to actions taken pursuant to the direction of the Trustee, Administrator, the Employer, and Investment Manager, a named Fiduciary or other third party with authority to provide direction to the Custodian."[25]   The 401(k) Plan document in particular further provides that "[t]he [Custodian][26] is not obligated to inquire as to whether [a distribution directed by the Administrator] is proper or within the terms of the Plan, or whether the manner of making any payment or distribution is proper."[27]   Further, the Plan documents state that "[t]o the extent permitted by the Code and the Act,  [MBA] agrees to indemnify and hold harmless [Matrix] against any and all claims, losses, damages, expenses and

---

[25] Doc. No. 117-8 at 60 (401(k) Plan Document); Doc. No. 117-9 at 43 (Cash Balance Plan Document).  The Court addresses below the plaintiffs' argument that the portions of the Plan Documents discussed here are void under ERISA.

[26] While, as Matrix explains, this provision refers to the "Trustee" rather than the "Custodian," the Plan documents elsewhere explain that "[a]ny reference in the Plan to a Trustee also is a reference to a Custodian unless the context of Plan indicates otherwise."  Doc. No. 117-8 at 60 (401(k) Plan Document); Doc. No. 117-9 at 43 (Cash Balance Plan Document).  And here, the context does not indicate otherwise.  MBA does not dispute this interpretation.

[27] Doc. No. 117-8 at 56 (401(k) Plan Document); *see also* 117-9 at 40 (Cash Balance Plan Document).  While the Cash Balance Plan documents do not appear to contain an identical provision, the plaintiffs do not argue that this represents any meaningful distinction between the Plan documents and the protections afforded by them to the Custodian.

liabilities [Matrix] may incur in the exercise and performance of [Matrix's] powers and duties hereunder, unless the same are determined to be due to gross negligence or willful misconduct."[28]  So, because in the plaintiffs' own words, Matrix completed each of the wire transfers in question "solely at the instruction and direction of Vantage,"[29] Matrix argues that the Plan documents bar the plaintiffs' claims against Matrix.

Second, Matrix points to the Services Agreement between it and Vantage and the Custodial Account Agreement between Matrix, Vantage, and MBA.[30]  When MBA engaged Vantage as its third-party administrator and made Vantage the Plan Administrator of the Plans, MBA engaged Matrix as a custodian as permitted by the provisions of the Plan documents just described.  Matrix enters into a Services Agreement with each of its third-party administrator clients, of which Vantage was one.  That Services Agreement—which Matrix entered into with Vantage here[31]—specifies that Vantage "has, and at all times during the term of this Agreement will have, the requisite authority from each of its Customers to act on their behalf in connection with this Agreement."[32]  It defines "Customer" as "an employer for which [Vantage] has entered into an agreement to provide record keeping services and

---

[28] Doc. No. 117-8 at 63 (401(k) Plan Document); *see also* Doc. No. 117-9 at 43 (Cash Balance Plan Document).  The plaintiffs do not argue that the slightly different wording of this provision in the Cash Balance Plan document has any significance here.

[29] Doc. No. 14 at 3, 10.

[30] The Court address below the plaintiff's arguments that the Custodial Account Agreements terms are void under ERISA and that there is a genuine dispute as to whether the Custodial Account Agreement was in effect here.

[31] Doc. 117-1 at 6.

[32] *Id*. at 12.

[Matrix] has entered into an agreement to provide custody . . . services . . . subject to the terms of this Agreement."[33]   Further, the Services Agreement provides that Vantage "will retain absolute and complete responsibility for the supervision of all of its representatives, employees or other agents, and . . . [Matrix] will have no supervisory, compliance or other responsibility as to the actions of such representatives, employees or agents of [Vantage.]"[34]   Relatedly, it provides that Matrix "shall not be liable for undertaking any act or instructions from [Vantage] or for failing to act in the absence of such instructions" and that Matrix "shall be entitled to conclusively rely on the authenticity of any notice or other communication received from [Vantage] so long as . . . [Matrix] reasonably believe[s] the notice or other communication to be genuine."[35]

The Services Agreement further specifies that Matrix will provide the custodial services described in its Custodial Account Agreement and that Vantage's customers "shall be subject" to that agreement.[36] This Custodial Account Agreement is an agreement between the third-party administrator, its plan sponsor customer, the plan's trustee, and Matrix.  The Custodial Account Agreement contains numerous provisions indicating that Matrix was entitled to rely conclusively on Vantage's instructions:

---

[33] *Id.* at 7.

[34] *Id.* at 12.

[35] *Id.* at 14.

[36] *Id.* at 8.

[Vantage][37] shall provide direction to [Matrix] on behalf of [MBA]. [Matrix] shall have no duty to take any action other than as specified in this Agreement unless [Vantage] provides [Matrix] with Instructions . . . . [Matrix] may conclusively rely upon, and be indemnified by [MBA] when in acting in good faith upon, any Instruction from [Vantage] or [MBA], or any other notice, request, consent, certificate, or other instrument or paper believed by [Matrix] to be genuine and properly executed, or any instrument or paper if [Matrix] believes the signature thereon to be genuine.[38]

It further provides that "[MBA] hereby designates and authorizes [Vantage] to provide Instructions to [Matrix] on behalf of [MBA] . . . and authorizes [Matrix] to disburse funds on behalf of the [MBA] upon Instruction from [Vantage]";[39]   "[MBA] agrees that [Matrix] may rely on Instructions from [Vantage] . . . and [MBA] agrees that [Matrix] shall be under no duty to make an investigation with respect to any Instructions received from [Vantage]";[40] "[MBA] is solely responsible . . . for the direction and supervision of [Vantage] . . . . All Instructions, directions, and/or confirmations received by [Matrix] from [Vantage] . . . shall be deemed to have been authorized by [MBA]."[41]

The Custodial Account Agreement contains numerous relevant provisions indemnifying Matrix and protecting it from liability:

[MBA] hereby agrees to indemnify, defend and hold [Matrix] . . . harmless from and against any and all loss, costs, damages, liability, expenses or claims of any nature whatsoever . . . arising, directly or indirectly thereof resulting from their reliance upon and any action that

---

[37] Vantage was the "designated representative" within the meaning of this agreement. The plaintiffs do not dispute this.

[38] *Id.* at 28.

[39] *Id.*

[40] *Id.*

[41] *Id.*

it takes in good faith in accordance with any certificate, notice, confirmation, or Instruction, purporting to have been delivered by [Vantage].[42]

This agreement further provides that "[MBA] agrees to indemnify and hold [Matrix] harmless for all costs, penalties, interest, and fees, including attorneys['] fees, it incurs with respect to any contention or allegation that the Custodian engaged in a prohibited transaction,"[43] and that "[MBA] waives any and all claims of any nature it now has or may have against [Matrix] . . . which arise, directly or indirectly, from any action that it takes in good faith in accordance with any certificate, notice, confirmation, or Instruction from [Vantage]."[44]

In summary, these provisions from both the Plan documents and the Custodial Account Agreement appear to expressly and unambiguously bar all of the plaintiffs' claims against Matrix by excusing them from liability, waiving any claims, and

---

[42] *Id.* at 34.

[43] *Id.*

[44] *Id.* The agreement contains numerous additional relevant provisions. *See, e.g., id.* ("[MBA] and [Meidinger] also hereby agree to indemnify, defend and hold [Matrix] . . . harmless from and against any and all loss, costs, damages, liability, expenses or claims of any nature whatsoever . . . directly or indirectly, out of any . . . action taken in reliance, on Instructions from [MBA], [Vantage] . . .; any other act or failure to act by [MBA], [Vantage] . . .; or any other act [Matrix] takes in good faith hereunder that arises under this Agreement or the administration of the Fund."); *id.* ("[Matrix] shall have no liability for making any distribution or transfer pursuant to the Instruction of [Vantage] . . . and shall be under no duty to make inquiry as to whether any distribution or transfer directed by [Vantage] is made pursuant to the provisions of the Plan or any applicable law, or as to such Instruction's effect for tax purposes or otherwise."); *id.* at 34–35 ("[Matrix] shall not be liable to [MBA] for any act, omission, or determination made in connection with this Agreement except for its gross negligence or willful misconduct. Without limiting the generality of the foregoing, [Matrix] shall not be liable for any losses arising from its compliance with Instructions from [MBA], [Vantage] . . .; or executing, failing to execute, failing to timely execute or for any mistake in the execution of any Instructions, unless such action or inaction is by reason of the gross negligence or willful misconduct of [Matrix]. [Matrix] shall not be responsible for any lost profits or any special, indirect or consequential damages in respect of any breach or wrongful conduct in any way related to this Agreement."); *id.* at 35 ("[Meidinger] acknowledges that [MBA's] duties under the Agreement are ministerial and do not relieve the Trustee of any of the duties set forth in the documents comprising the Qualified Plan and any related Trust.").

indemnifying them.  Apparently recognizing this, the plaintiffs offer no meaningful argument against their applicability based on the terms of these documents themselves.[45]   Rather, they argue that the parties did not actually enter into the Custodial Account Agreement, and that, even if they did, those provisions from both the Custodial Account Agreement and the Plan documents that purport to indemnify or relieve Matrix from liability are void under ERISA.

### C.   There is no genuine dispute over whether the Custodial Account Agreement was in effect here.

The Court first addresses the plaintiffs' argument that the parties never entered into the Custodial Account Agreement.  The plaintiffs argue that they "never received nor executed it on behalf of either plan" and that "[t]here is no evidence to support a finding [that] any of the Plaintiffs entered into the [Custodial Account Agreement]."[46]   And Meidinger says he does not remember ever seeing this document.[47]   However, while it is true that discovery apparently failed to yield a signed copy of the Custodial Account Agreement, MBA did produce an addendum to the Master Services Agreement MBA entered with Vantage, which Meidinger

---

[45] The plaintiffs do not, for example, suggest that Matrix did not believe that the instructions it received from Vantage were genuine, or that any of Matrix's actions were not in good faith.  The plaintiffs do summarily argue that, because "the plan document language Matrix relies on only purports to relieve Matrix from liability for following direction of an 'administrator . . . or other third party with authority to provide direction to the Custodian,'" and the transactions here "were in fact not authorized," and "Matrix cannot rely on a [Custodial Account Agreement] or other sources to argue that [Vantage] or the Richies had any authority to direct Matrix's disposition of Plaintiffs' assets." Doc. No. 132 at 22.  While the Court does not entirely understand what the plaintiffs mean by this, the whole point of the Plan documents and Custodial Account Agreement was to establish that Vantage *did* have the authority to direct Matrix's disposition of Plan funds and that Matrix *was* entitled to rely on directions from Vantage as genuine, and that Matrix cannot be held liable for doing so in good faith.

[46] Doc. No. 132 at 22.

[47] Doc. No. 133-4 at 2–3.

signed.[48]   Meidinger says he does not remember ever seeing the Master Services Agreement either,[49] and discovery has failed to yield a signed copy of the Master Services Agreement.  But the addendum states that "[t]his Addendum is made part of the Master Services Agreement . . ., and the Master Services Agreement is incorporated herein as if fully set forth."[50]  And the Master Services Agreement, the form of which MBA did produce in discovery, states that

> [MBA] hereby appoints [Matrix] as custodian of the plan account established by this Application and Agreement and authorizes [Matrix] and its agents to perform the custodial services as described in the custodial agreement.  The undersigned also acknowledges receipt of a copy of the custodial agreement (see Exhibit B) and agrees to be bound by the terms of the custodial agreement . . . .[51]

Exhibit B to this Master Services Agreement is the Custodial Account Agreement.[52]   As the Supreme Court of Texas has explained, "[d]ocuments incorporated into a contract by reference become part of that contract."[53]  And "an unsigned paper may be incorporated by reference in the paper signed by the person sought to be charged.  The language used is not important provided the document signed plainly refers to another in writing."[54]  So, this signed addendum—which both acknowledges that the parties had already entered into the Master Services

---

[48] Doc. No. 117-7.

[49] Doc. No. 133-4 at 2.

[50] *Id.*

[51] Doc. No. 117-6 at 18.

[52] *Id.* at 20.

[53] *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010).

[54] *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (quoting *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968)).

Agreement and expressly incorporates it—indicates that the Master Services Agreement and, in turn, the Custodial Account Agreement, was agreed to and in force here.[55]  Nonetheless, despite repeatedly pointing to the Master Services Agreement in their original complaint, the plaintiffs now argue that the apparent non-existence of signed copies of the Master Services Agreement and the Custodial Account Agreement undermines Matrix's claim that those agreements were in force here to the point of creating a genuine dispute of fact.  Further, they claim, without pointing to any authority or explaining the logical basis for this contention, that the idea that the signed addendum demonstrates that the plaintiffs had entered into the Master Services Agreement and Custodial Account Agreement is "tenuous and legally insupportable."[56]

The Court disagrees.  The signed addendum expressly acknowledges the existence of the Master Services Agreement and incorporates it, and the plaintiffs offer no alternative interpretation of or explanation for its terms.  So, the lack of signed copies of these agreements does not create a genuine dispute of fact where the signed addendum, the plaintiffs' own production of the form Master Services Agreement, Matrix's agreements with Vantage,[57]  and the parties' conduct combine

---

[55] That the addendum itself is specifically related to the Cash Balance Plan is of no consequence, as it references and incorporates the Master Services Agreement as a whole.

[56] Doc. No. 132 at 23.

[57] As Matrix points out, even if the plaintiffs had not directly entered into the Master Services Agreement and the Custodial Account Agreement, they would likely still be bound to these agreements by virtue of its agent Vantage's agreements with Matrix.  Doc. No. 119 at 16–17.  The plaintiffs do not appear to offer any response to this agency argument beyond their contention that they never agreed to the Master Services Agreement with Vantage.

16

to indicate that the Master Services Agreement and the Custodial Account Agreement were agreed to and in effect here.

### D.    MBA was not an ERISA Fiduciary.

Next, the plaintiffs point to 29 U.S.C. section 1110(a), under which "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy."  Because, according to the plaintiffs, Matrix was a fiduciary under ERISA, Section 1110(a) voids those provisions discussed above that appear to relieve Matrix from liability.  So, the Court must consider whether Matrix was in fact an ERISA fiduciary.[58]

Under ERISA, a fiduciary may be either a "named" fiduciary or a "functional" fiduciary.  Here, the plaintiffs argue that Matrix is a functional fiduciary.  Title 29, section 1002(21)(A) of the United States Code sets out the standard for determining whether a person is functional fiduciary:

> [A] person is a fiduciary with respect to a plan to the extent (i)  he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii)  he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii)  he has any discretionary authority or discretionary responsibility in the administration of such plan.  Such term includes any person designated under section 1105(c)(1)(B) of this title.

---

[58] Because, as explained below, the Court concludes that Matrix was not an ERISA fiduciary, it need not consider Matrix's arguments that indemnification provisions and allocations of fiduciary responsibilities, at least in plan documents, are permissible under section 1110(a).  *See* Doc. No. 119 at 9–10.

As the Fifth Circuit has explained, "A person is a fiduciary only with respect to those portions of a plan over which he exercises control."[59]  And courts are to determine whether a purported fiduciary in fact is a fiduciary "without succumbing to the improper influence of titles and labels."[60]   Rather, "Section 1002(21)(A) provides a functional definition of a fiduciary which depends, in part, upon whether a person 'exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets.'"[61]

"While some courts have indicated that literally *any* authority or control respecting management or disposition of plan assets, without reference to whether any discretion is involved, will support a finding that an entity is a fiduciary, . . . the Fifth Circuit is not among them."[62]   Rather, "[t]o be fiduciaries, [the persons in question] must exercise discretionary authority and control that amounts to actual decision making power."[63]  So, even when an entity "assumes discretionary authority or control over plan assets, [it] will not be considered a fiduciary if that discretion is sufficiently limited by a pre-existing framework of policies, practices and

---

[59] *Am. Fed'n of Unions Loc.al 102 v. Equitable Life Assurance Soc'y*, 841 F.2d 658, 662 (5th Cir. 1988).

[60] *Reich v. Lancaster*, 55 F.3d 1034, 1048 (5th Cir. 1995) (citing 29 U.S.C. § 1002(21)(A)).

[61] *Id.* (quoting *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1459 (9th Cir. 1995)) (cleaned up).

[62] *Tower Loan of Miss. v. Hosp.  Benefits, Inc.*, 200 F. Supp. 2d 642, 648–49 (S.D. Miss. 2001).

[63] *Reich*, 55 F.3d at 1049.

procedures."[64]  So, for example, "[a] third-party administrator who merely performs ministerial duties or processes claims is not a fiduciary."[65]

Here, in the plaintiffs' own words, Matrix completed each of the wire transfers in question "solely at the instruction and direction of [Vantage]."[66]  After all, Matrix was engaged by Vantage and MBA to do just this.  And Matrix's Services Agreement with Vantage specified that Vantage "has, and at all times during the term of this Agreement will have, the requisite authority from each of its Customers to act on their behalf in connection with this Agreement."[67]  It furthers provides that Matrix "shall not be liable for undertaking any act on instructions from [Vantage]" and that Matrix "shall be entitled to conclusively rely on the authenticity of any notice or other communication received from [Vantage] so long as [Matrix] reasonably believe[s] the notice or other communication to be genuine."[68]

The plaintiffs argue that Matrix was a fiduciary because it exercised control over the fund assets in question by "holding the assets in its own account, one subject to the control of no person except Matrix, and [by directing] JPMorgan Chase to make the illegal payments."[69]  According to the plaintiffs, this was sufficient to make Matrix a fiduciary, because an ERISA fiduciary is "one who exercises any control of plan

---

[64] *Id.* at 1047 (quoting *Useden v. Acker*, 947 F.2d 1563, 1575 (11th Cir. 1991), *cert. denied*, 508 U.S. 959 (1993).

[65] *Id.*

[66] Doc. No. 14 at 3.

[67] Doc. No. 117-1 at 12.

[68] *Id.* at 14.

[69] Doc. No. 132 at 25 (emphasis omitted).

assets,"[70] and "discretion is not required."[71]   But such an argument is flatly at odds with section 1002(21)(A), from which plaintiffs purportedly draw this minimal "any control" standard, and with the standards set out in the Fifth Circuit caselaw discussed above.   Specifically, section 1002(21)(A)(i) states that a person is a fiduciary if "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets."   Read as a whole, the provision requires that to be considered a fiduciary, a person must "exercise discretionary authority and control that amounts to actual decision making power"[72] over what is done with plan assets to be considered a fiduciary.[73]   In merely providing custodial services and initiating the transfers in question as ordered by Vantage, Matrix exercised no such power.[74]   And the plaintiffs point to nothing else to suggest that Matrix did in fact

---

[70] *Id.* at 24.

[71] *Id.* at 25.

[72] *Reich*, 55 F.3d at 1049.

[73] While the plaintiffs claim support from out-of-circuit *David P. Coldesina, D.D.S. v. Estate of Simper,* 407 F.3d 1126 (10th Cir. 2005), in that case the Tenth Circuit's conclusion that the individual in question was exercising sufficient control to be a functional fiduciary hinged on the fact that the individual "assumed control over disposition of the funds by exercising his own judgment rather than acting at the plan's direction" by changing the entity to whom they would make plan checks payable. *Id.* at 1134.   While the individual claimed that he was only acting at the direction of the plan's investment advisor, this argument was unavailing: after all, he "[was] hired by the plan, not [the investment advisor], and [was] entrusted with the plan's money not [the investment advisor's]. They simply cannot avoid this fact by asserting that the devil made them do it." *Id.* at 1135.   Here, Matrix's contracts required it to assume that Vantage "has, and at all times during the term of this Agreement will have, the requisite authority from each of its Customers to act on their behalf in connection with this Agreement." Doc. No. 117-1 at 12.   So, Matrix did not "assume[] control over disposition of the funds by exercising its own judgment rather than acting at the plan's direction," because it was entitled to treat the instructions it received regarding the transfers in question as directions from MBA itself. *See Coldesina*, 407 F.3d at 1134.

[74] After all, if such custody and actions constituted adequate power to be considered a fiduciary, it appears that JPMorgan Chase itself would qualify as a fiduciary here as it was the entity that actually held the funds in question and transferred the funds based on the directions it received. *See,*

exercise such power, nor that it did anything here other than follow Vantage's directions in completing the ministerial tasks assigned to it. Accordingly, Matrix was not a functional fiduciary under ERISA.[75] So, the provisions from both the plan documents and the Custodial Account Agreement[76] that relieve Matrix from liability are not void under Section 1100(a), and they relieve Matrix from liability here from both the negligence and ERISA claims.[77] And of course, even in the absence of such provisions, Matrix's non-fiduciary status means the plaintiffs' ERISA claims against Matrix that may only be brought against a fiduciary would still be subject to dismissal.

## V.    Conclusion

For the foregoing reasons, the Court **DENIES** the plaintiffs' motion for partial summary judgment [Doc. No. 107], **GRANTS** Matrix's motion for summary judgment

---

*e.g.*, *Nagy v. DeWese*, 771 F. Supp. 2d 502, 515–16 (E.D. Pa. 2011) ("[T]the mere practical ability to act against an account holder's instructions to prevent fraud cannot constitute authority or control over plan assets; otherwise, any bank holding plan funds would become a fiduciary by virtue of its ability to place restrictions on an account in cases of potential fraud."); *see also, e.g.*, *In re Nighthawk Oilfield Servs. Ltd.*, No. H-11-0079, 2012 WL 13156742, at *5 (S.D. Tex. Mar. 23, 2012) ("[A] bank does not assume fiduciary status by either holding plan assets in an account or by exercising its rights as a lender and seizing an account that is used as collateral and that includes plan assets. . . . Neither its possession of [such an account] nor its sweeping of that account make [a bank] a fiduciary under ERISA.").

[75] *See, e.g.*, *Turner v. Talbert*, No. 04-450-JJB-DLD, 2011 WL 44797966, at *2 (M.D. La. Sept. 27, 2011) (concluding that an entity analogous to Matrix was not an ERISA fiduciary because it "merely exercised physical control [of plan assets] for the performance of mechanical administrative tasks" and "never exercised discretionary control, authority, or responsibility such that it amounted to the actual decision maker regarding plan management or administration."), *aff'd sub nom, Turner v. Pan Am. Life Ins. Co.*, 478 F. App'x 915 (5th Cir. 2012).

[76] Because the Plan documents themselves require summary judgment in Matrix's favor, summary judgment on those claims would be appropriate even if there were a genuine dispute of material fact as to whether the Custodial Account Agreement were in effect here.

[77] Because the Court has concluded that the negligence claims are barred by both the Plan documents and the parties' agreements, it need not consider Matrix's additional arguments for their dismissal.

21

[Doc. No. 116], and **DISMISSES WITH PREJUDICE** all of the plaintiffs' claims against Matrix.  Because the Court's opinion does not depend on either party's expert witness testimony or any objected to evidence, the Court **DISMISSES AS MOOT** the parties' motions to exclude [Doc. Nos. 113 and 115] and the plaintiffs' objections [Doc. No. 134].   And because the Court's opinion moots Matrix's fourth and fifth counterclaims against the plaintiffs, the Court **DISMISSES AS MOOT** both counterclaims four and five and the plaintiffs' motion to dismiss them [Doc. No. 124].

**IT IS SO ORDERED** this 3rd day of August, 2022.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

22